LLOYD A. ROBERTSON ET AL v.
HARRY C. BERRY ET AL

5-5187                                      451 S. W. 2d 184

Opinion delivered March 16, 1970

*Smith, Williams, Friday & Bowen,* for appellants.

*Phil Dixon* and *Phillip Lyon,* for appellees.

JOHN A. FOGLEMAN, Justice. Appellants own three

adjoining lots in Plaza Terrace Addition to Little Rock. The Pierces own one on which they live and the Robertsons own two. The dwelling house of the Pierces is located on their lot in the extreme northeast corner of the subdivision at the intersection of Markham and McKinley Streets. The Robertson lots also face on West Markham. The subdivision is bounded by West Markham Street on the north and McKinley Street on the east. It consists of 33 lots, only two of which (those owned by the Robertsons) are vacant.

A bill of assurance for the subdivision was filed by its owners on March 26, 1958, while it was still outside the city limits. Restrictive covenants provide that all lots and building sites in the addition be used for residential lots only. The covenants run with the land and are binding at least until the year 2000. The owners of 51% of the front footage of all lots in the addition may revoke, alter or amend any of these covenants, conditions or restrictions.

Appellees are owners of most of the other 30 lots in the subdivision, only four of which have any frontage on Markham. The rear of three of appellees' lots is on McKinley. This street runs alongside another of their lots.

Appellants brought this action to cancel the covenant restricting the use of their property on the ground that the restriction was no longer useful or beneficial for the purposes intended so that an unjust confiscation of their property resulted. The chancellor denied the relief sought, holding that appellants had failed to meet their burden of proof. He found that the testimony showed that cancellation of the restrictive covenants would reduce the value, and otherwise adversely affect the use, of appellees' property for residential purposes. This appeal from that decree is based upon a contention that the evidence preponderates in favor of appellants and that we should grant the relief on trial de novo. We are unable to agree, however, that the chancellor's findings are clearly against the preponderance

of the evidence. Thus, we affirm the decree.

Appellants rely upon our decisions in *City of Little Rock* v. *Joyner*, 212 Ark. 508, 206 S. W. 2d 446, and *Storthz* v. *Midland Hills Land Company*, 192 Ark. 273, 90 S. W. 2d 772. They particularly emphasize the following language from the Joyner case:

> ". . . [E]quity will and should entertain a bill which has the purpose of cancelling a restrictive covenant in a deed as a cloud upon title wherein it is alleged that the conditions surrounding the property have so changed as to utterly destroy its value for the purpose for which the restriction was promulgated to prevent, and that this change of conditions is due to no fault on the part of the petitioner and will work no irreparable injury to others.

> 'Stated another way, equity should entertain jurisdiction to cancel a restrictive covenant in a deed where it would be oppressive and inequitable to give the restriction effect as where the enforcement would have no other result than to harass or injure the one without accomplishing the purposes for which originally made.'"

Appellants offered evidence which tended strongly to show that their property had depreciated in value as a result of commercial developments in adjacent areas to an extent unforeseen by anyone at the time of the filing of the bill of assurance. The following facts were stipulated:

> Markham is located upon a right-of-way 60 feet wide. From McKinley Street west, it was being widened to four lanes, its width to the east of the property. In December 1968 the daily traffic volume on Markham had reached 15,000 to 16,000 vehicles per day, with a peak volume of approximately 3,100 vehicles between 4:00 and 6:00 p.m. and of 1,500 between 7:00 and 9:00 a.m. It is one of four major traffic arteries feeding western Little Rock,

but has a somewhat lower traffic volume than the other three. The traffic rate is expected to increase at the rate of approximately 6% per year. A traffic light was to be placed at the Markham-McKinley intersection within the succeeding few months. The intersection ranks eleventh in the city in frequency of automobile accidents. On days when traffic is especially heavy a policeman is on duty at the intersection directing traffic at 9:00 a.m. West Markham is brightly lighted by mercury vapor lights from University Avenue east of the addition for some distance to the west, well beyond this addition.

The street lights are mounted upon large steel poles about 40 feet high, one of which is about two feet west of Pierce's driveway and another 100 to 150 feet west. A Shell service station was built just across McKinley street from appellants' property in 1968. A greenhouse just west of the addition is a non-conforming commercial property. It was in existence before the addition was platted or the bill of assurance filed. Hughes Street is the first street west of the addition. The property southeast of the Markham-Hughes intersection is still an undeveloped wooded tract, zoned for apartments. The area north of Markham and west of McKinley is all zoned for family residential use. The property immediately across Markham is a very high type residential area and there are residences across the street from appellants' three lots.

There are no vacant houses in Plaza Terrace Addition. The addition is a neighborhood of nice, neat, well maintained homes, with neat, orderly, well kept lawns, with every indication of pride in the neighborhood.

Pierce purchased his lot in 1961. Robertson bought one lot on February 24, 1959, and the other on January 25, 1961, both for residential purposes. Pierce moved onto his lot to be closer to town and the stores. Markham Street was described as a typical farm-to-market

road 24 feet wide in early 1958. Curbs and gutters were added when Plaza Terrace and Plaza Heights, the addition immediately across Markham, were developed. In 1961 the street was only 28 feet wide, but it has been subsequently widened twice. McKinley Street, now an entrance to the large Mall Shopping Center, was then only a wagon road. The land immediately to the east of McKinley was residential. The Mall Shopping Center is now located between McKinley and University Avenue, only a short distance east and south of the Pierce property.

According to Robertson when he bought his first lot a service station was northeast of the McKinley-Markham intersection,[1] and between McKinley and University, the Plaza Towers Apartments, the Fausett Plaza Building at the corner of Markham and University and a drive-in restaurant[2] were in existence. He testified that Park Plaza Shopping Center had been constructed across Markham, in the next block to the east, except for additions made in the past four years. A school four blocks to the south has been eliminated and the property is now part of a shopping center. University Avenue, 1,324 feet east of Plaza Terrace Addition, was not four lanes wide. The Georgetown Apartment just across the street forming the south boundary of the subdivision had not then been built.[3] A few houses had been built in the addition.

Pierce's driveway is only a few feet from, and parallel to McKinley. He complained that some motorists enter the driveway rather than the street and that he has trouble driving out of his driveway during peak traffic hours. He also testified that no lights are ever needed in his house at night because of the brightness of the street lights and of the lights in the shopping centers.

[1] C. V. Barnes testified that this service station was not built until early 1960.

[2] A Texaco service station now occupies this site.

[3] C. V. Barnes testified that these apartments were built in 1963 and 1964.

Neither the Pierces nor the Robertsons have ever listed their respective properties with a real estate agent for sale, nor have they made any effort to sell them. Neither Pierce nor Robertson professes to know whether his property could be sold for residential purposes or the price it might bring. Each gave Shell Oil Company an option, never exercised. Pierce's property for which he paid $22,500 would have brought $75,000. Robertson gave an option to lease, but he felt that he could obtain more money from the oil company than he could for residential purposes.

The president of a savings and loan association, which usually loaned 80% of the cost of house and lot on desirable residential property, would be unwilling to lend more than 50% for residential construction on appellants' lots. Although he did not consider that the property was now suited for residential purposes, he stated that its value had not been destroyed for those purposes. He admitted that his company relied on restrictive covenants.

A real estate agent found a change in the market for houses on Markham during the last three years, because of traffic volume, so that a longer period of time was required to find a purchaser for them than was necessary in other locations. While it was her opinion that appellants' property had depreciated in value from 35% to 50%, she would not be surprised to learn that a recognized loan company would make an 80% loan for residences on the Robertson lots. She had sold two homes in the subdivision and would expect the buyers to be able to rely upon the restrictions in the bill of assurance.

Appellants called as a witness Russell McLean, a contractor and professional appraiser, who has been acquainted with the area for 50 years, very closely since 1950. This witness related the history of the remarkable development making University Avenue, near its Markham crossing, known as the "miracle mile" and the intersection one of the most important commercially

in Arkansas. He considered everything between the addition and University, both north and south of Markham, as commercial, and Park Plaza and the Mall two of the state's largest shopping centers. He was of the opinion that appellants were suffering from bad planning because of frontage on Markham, and that their lots were undesirable for residential purposes because of the two large shopping centers, and the lack of a buffer between commercial and residential use. He also expressed the opinion that the property in the subdivision had reached its peak insofar as residential use is concerned, as all subdivisions tend to do when the last lot is developed. He felt that the property must seek a higher level to increase in value. The three lots in particular and the entire subdivision to the extent appellants' property did not serve as a buffer were said by him to be suffering from economic obsolescence brought on by surrounding developments. He opined that a house built on Robertson's property would sell for only about one-half of its cost because of the lights, noise and traffic, some of which continues 24 hours per day. He thought that commercial use of appellants' property would not harm the remaining property any more than it is already injured by commercial use across McKinley.

The testimony of C. V. Barnes, a real estate counselor, was of the same tenor as that of McLean. He stated that the purpose of protective covenants is to assure the purchasers within a subdivision of the similarity of character of the improvements placed therein, but not to guarantee stabilization of value. In his opinion, removal of the restrictions would tend to offset the decrease in value of property in the addition suffered by reason of the development of adjacent property. He admitted that the four abutting lots would be affected by commercial use of appellants' property to an extent dependent upon the particular use to which the three lots were put. He felt that the Pierce residence could be sold for some price lower than that identical residential property in the interior of the subdivision would bring.

He thought that it would be difficult to sell the Robertson lots for residential purposes, but acknowledged that they would have some value for that purpose. He classified the neighborhood as being permanent as any, but not as permanent in residential character as a subdivision not surrounded by what he called "higher use." It was his opinion that the owners of all the property in the subdivision would receive more for their money by removal of the restrictions to permit development of the property for these "higher uses."

Appellees produced testimony tending to show that they had purchased lots in the subdivision, as late as August, 1968, in reliance upon the restrictive covenant, and that in many instances the restriction was the deciding factor in choice of location. Proximity of certain schools, a church and the shopping centers was also considered a desirable factor by certain lot owners. The owner of the adjoining lot on Markham had built a home in December, 1956. He did not look upon his home as an investment, but hoped to live there the rest of his life. He is a service station operator who felt that such an operation is not a desirable neighbor for residential property. The owner of one of the lots adjoining appellants' on the south was of the opinion that certain commercial uses of appellants' property (such as a service station) created hazards from automobiles, gasoline, etc. because of a downward slope away from Markham. Some witnesses characterized the subdivision as stable, and emphasized the fact that there had been few changes in ownership or occupancy.

Appellees also offered the testimony of Sam Reynolds, a real estate broker. He described Plaza Terrace Addition as an extremely stable neighborhood of homes in an appraisal range from the high twenty to low thirty thousands. He found 15 of the original owners still living in the subdivision, and a turnover smaller than found in the usual subdivision. He valued the Robertson lots at $3,500 each for residential purposes, and the Pierce residence at from $23,000 to $26,000. He predicted an immediate and accelerating decline in

values of the remaining lots if appellants' property was used for purposes other than residential. He foresaw apprehension on the part of owners and misgivings by prospective purchasers affecting the whole subdivision if the restrictions were lifted, even for the three lots only. He admitted that the lots along McKinley and those facing the Georgetown Apartments had suffered some depreciation in value and that appellants' property was not as desirable for residential property as it had been. He felt that the interior lots were more desirable although he believed that they would undergo some depreciation in value. He saw tendencies toward stabilization of values and neighborhood characteristics resulting from bills of assurance. He found that the entire subdivision had a potential for a highly valuable commercial use 15 to 20 years hence but had discarded the idea of attempting to acquire the ownership as one block at present.

The manager of the mortgage loan department of a savings and loan association testified that appellants' lots had value for residential purposes and that he would make an 80% loan for residential construction on either of the two vacant lots to a borrower with a good credit rating and a steady income, or a 90% loan to certain preferred borrowers.

Henry M. deNoble, former Director of Community Development and later Director of Planning and Traffic for the City of Little Rock, diagnosed removal of the restrictive covenant on the three lots as cancer-like. It was his opinion that the remainder of the subdivision would lose its residential character. He gave examples of other predominantly residential areas in Little Rock through which traffic volumes were at least as great as that passing appellants' lots. He considered the subdivision well planned and still desirable as a residential area. McKinley Street seemed to him to be an adequate buffer between the residential and commercial areas.

Whatever may be said about the impairment of the value of appellants' property for residential purposes,

there is evidence that its value for residential purposes has not been destroyed. There is impressive evidence from which it could reasonably be found that removal of the restrictive covenant would materially injure appellees, who acquired their property in reliance thereon. After carefully weighing the evidence, we cannot say that conditions have so changed since the filing of the bill of assurance as to make the covenants useless in securing the benefits to purchasers sought to be protected thereby. To say the least, we cannot say that the chancellor weighed the evidence incorrectly.

The decree is affirmed.